IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JUAN PABLO VAZQUEZ,** | : | **Civil No. 1:15-CV-350** |
| | : | |
| **Petitioner** | : | |
| | : | **(Judge Rambo)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **NANCY GIROUX, et al.,** | : | |
| | : | |
| **Respondents** | : | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On March 16, 2011, following a bench trial, Juan Pablo Vazquez was convicted in the Court of Common Pleas of Susquehanna County of three counts relating to drug trafficking.  Vazquez's charges stemmed from a July 21, 2010, traffic stop which led to the discovery of two kilograms of cocaine hidden in envelopes under the passenger seat of the vehicle.  Vazquez was sentenced to a 7-10 year term of imprisonment on the convictions.  He is currently housed at the State Correctional Institution in Albion, Pennsylvania.

Following his conviction, Vazquez pursued direct and collateral challenges to his conviction in the Pennsylvania state courts, all of which were unsuccessful.  On February 20, 2015, Vazquez filed a petition for a writ of habeas corpus with this Court.  That petition is fully briefed and ripe for disposition, and for the following reasons it is recommended that the petition be denied.

## II.   BACKGROUND

### A.   Factual Background

The background to this case is straightforward, as is the procedural history that was completed prior to Vazquez filing the instant habeas petition.

On July 21, 2010, Vazquez was driving a car along Interstate 81 in Lenox Township, Susquehanna County when he was stopped by Pennsylvania State Trooper Thomas Horan for a motor vehicle violation for following another vehicle too closely.  (Doc. 11, Commonwealth Exhibits ("Comm.") Ex. 1.)  During this minor traffic stop, Trooper Horan prepared a warning to give to Vazquez.  (Comm. Ex. 5, at 32-33.)  During the stop, Trooper Horan asked Vazquez to exit the vehicle he was driving so he could speak with him.  (Comm. Ex. 5, at 62.)  During this encounter, Trooper Horan explained the nature of the violation and the warning, and had Vazquez sign the written warning that was provided.  (Comm. Ex. 5, at 33.)

At this point the interaction came to an apparent close; however, as Vazquez arrived back at his vehicle, Trooper Horan asked him if he could answer a few more questions.  (Comm. Ex. 5, at 33, 53, 47.)  A matter of seconds had elapsed between the men returning to their respective vehicles and Trooper Horan asking Vazquez if he would answer some questions.  (Comm. Ex. 5, at 64.)  Vazquez agreed, and engaged in a discussion with Trooper Horan that included providing

2

information about his travel itinerary, his prior criminal drug conviction, and his probation. (Comm. Ex. 5, at 33-34.) Trooper Horan asked Vazquez if he would consent to a search of the vehicle, and Vazquez again agreed. (Comm., Ex. 5, at 36.)

The record also indicates the reasons Trooper Horan's suspicions were raised. (Comm. Ex. 5, Transcript of Dec. 22, 2010 Omnibus Hearing.) Trooper Horan testified that among the reasons he became curious about Vazquez's travel included the fact that his key ring only held a single key aside from the ignition key itself; Vazquez demonstrated a highly elevated sense of nervousness, including profuse perspiration and an elevated heartbeat that caused Vazquez's carotid artery to beat rapidly and visibly; and the presence of multiple air fresheners and a strong odor of cologne emanating from inside the vehicle, something that the Trooper testified he was familiar with in the case of drug traffickers. Additionally, Trooper Horan testified that Vazquez lied to him about his criminal history, which Trooper Horan learned included a prior conviction for felony cocaine delivery in New York, which resulted in a sentence of probation that was active. Additionally, Trooper Horan testified that Vazquez's visible anxiety continued throughout their encounter, and that Vazquez gave a narrative regarding his travel that made no sense. (Comm. Ex. 5.) Vazquez consented to allow Trooper Horan to search the vehicle, and Trooper Horan discovered two kilos of cocaine. (*Id.*)

3

On July 21, 2010, Vazquez was charged via criminal information with felony and misdemeanor drug offenses. The information was filed charging Vazquez with one felony count of Possession of a Controlled Substance with Intent to Deliver, in violation of 35 P.S. § 780-113(a)(30), one misdemeanor count of Possession of a Controlled Substance under 35 P.S. § 780-113(a)(16), and one misdemeanor count of Possession of Drug Paraphernalia under 35 P.S. § 780-113(a)(3). (Comm. Ex. 2.)

### B.    Procedural History

On September 17, 2010, Vazquez filed an omnibus pretrial motion that sought, in part, to suppress the drugs that were seized from his vehicle on the grounds that the search and seizure violated the Fourth Amendment to the United States Constitution and as well as the Pennsylvania Constitution. (Comm. Ex. 3.) In his brief, argued that the brief traffic stop and investigatory detention had concluded when Trooper Horan unlawfully reengaged Vazquez in conversation, holding him without justification. (Comm. Ex. 4.) The trial court convened an evidentiary hearing on December 22, 2010. (Comm. Ex. 5.) During this hearing, Trooper Horan testified, as did Trooper Paul Lindsay.

Trooper Horan testified to his experience as a member of the Pennsylvania State Police and to his training in drug interdiction and investigation. (Comm. Ex. 5, p. 2-3.) Trooper Horan testified that around 5:00 PM on July 21, 2010, he

4

observed a Honda Civic traveling northbound on I-81 that was following too closely to another vehicle.  After observing the vehicle and determining that the driver had not increased the distance between his car and the vehicle in front of him, Trooper Horan initiated a traffic stop near mile marker 210.  (*Id.*, p. 5.) Trooper Horan testified that he noted a single key in the ignition, with no other keys on the ring, which his training had informed him sometimes indicated the use of a third party's car; in this case, Vazquez indicated that the car belonged to his cousin. (*Id.*, p. 10.)  Trooper Horan also noted a very strong odor of cologne and the presence of air fresheners in the vehicle. (*Id.*)

Additionally, Trooper Horan testified that Vazquez exhibited extreme nervousness at the encounter, far in excess of what is typical when motorists are stopped.  (*Id.*)  In this regard, Trooper Horan testified that Vazquez had sweat dripping off of his head, and that his carotid artery was visibly pulsating.  (*Id.*) Trooper Horan asked Vazquez if he had ever been arrested before, which is a question that the Trooper typically asks when he encounters a visibly nervous motorist. (*Id.*, at pp. 10-11.)  At this point, Trooper Horan returned to his cruiser where he ran a criminal history on Vazquez, which came back with a 2007 arrest for delivery of controlled substances and that Vazquez was currently on probation in New York. (*Id.*, p. 11.)  Having learned this, Trooper Horan called Trooper Lindsay for backup both for safety and because what he had observed and learned

in the course of the traffic stop had given him reason to investigate Vazquez further. (*Id.*)

After Trooper Lindsay arrived, it appears that suspicions were further raised because Vazquez gave Trooper Lindsay some inconsistent information regarding the nature of his travel; he had told Trooper Horan that he was heading back to New York because his aunt had suffered a heart attack, whereas he could be heard telling Trooper Lindsay that it was his grandmother who was ailing. (*Id.*, p. 13.) Trooper Horan wrote Vazquez a warning and went over it with Vazquez while both men were outside their vehicles. Trooper Horan had Vazquez sign the warning, and then told him he was free to go. When Vazquez had nearly reached his vehicle, Trooper Horan asked him whether he had a minute to answer a couple further questions, and Vazquez agreed. (*Id.*, p. 14.) The two men talked about Vazquez's travel itinerary: Vazquez now told the Trooper that he was traveling from the Poconos to Patterson, New Jersey where his uncle was going to provide him with some windows, but also that he had gotten a call that his aunt in Dunkirk, New York had a heart attack and he was heading there. (*Id.*)

Trooper Horan testified that at this point Vazquez's anxiety had visibly increased. He was beginning to stammer, kept repeating the Trooper's questions, and provided a series of confusing and inconsistent answers to Trooper Horan's inquiries regarding his criminal background. Inconsistent answers which included

lying to Trooper Horan by telling him that he had received five years of probation for possessing a small amount of marijuana, whereas the criminal history report indicated that Vazquez had been convicted of charges involving cocaine.  (*Id.*, p. 15.)  Trooper Horan proceeded to ask a few more questions, and asked Vazquez if there was anything illegal in the vehicle.   When Vazquez denied having any contraband, Trooper Horan asked if he could look in the car.  Vazquez agreed. (*Id.*, p. 16-17.)   After Trooper Horan began searching the car, Vazquez began telling Trooper Lindsay that the car had not been in his possession all day, but had been with his cousin.  (*Id.*, p. 18.)  Trooper Horan continued to search, finding the vehicle essentially empty but for a large plastic bag under the passenger seat.  That bag was found to contain two manila envelopes packaged with a substance that appeared to be cocaine.  Vazquez was then arrested, Mirandized, and placed in the patrol car.  He declined to answer any further questions.  (*Id.*, p. 20.)  The material in the package was tested and confirmed to be approximately two kilograms of cocaine. (*Id.*)

During the evidentiary hearing, Trooper Horan was cross-examined by Vazquez's attorney, who asked a number of questions regarding the traffic stop and eventual search.  Trooper Lindsay was also questioned by the prosecution and defense regarding his role in the encounter.

Notably, during the hearing, Vazquez's lawyer conceded that the traffic stop was justified and that his client consented to the search of the vehicle. He attempted to argue, however, that the stop had become custodial or an unlawful seizure before consent was given. The Court took the matter under advisement, and on January 13, 2011, denied the suppression motion, finding that the traffic stop was no more than a brief encounter, that Vazquez was free to leave, and that Vazquez voluntarily stayed, answered additional questions, and consented to the search of his vehicle. (Comm. Ex. 6.)

On March 16, 2011, the matter was tried before a judge as fact-finder. During this trial, the parties agreed to stipulate to the admissibility of the testimony elicited during the suppression hearing. (Comm. Ex. 7.) Following testimony, the judge convicted Vazquez of all three charges. (Comm. Ex. 8.) On April 20, 2011, Vazquez was sentenced to be imprisoned for a term of 7 to 10 years. (Comm. Exs. 9 and 10.)

On May 13, 2011, Vazquez filed a notice of appeal. (Comm. Ex. 11.) Following briefing, which concluded on January 28, 2011, (Comm. Exs. 12-15), the Pennsylvania Superior Court denied Vazquez's appeal on March 29, 2012. (Comm. Ex. 16.) In its ruling, the Superior Court found that Vazquez had not been unlawfully detained, that the interaction between Vazquez and the Troopers following his traffic stop amounted to no more than a mere brief encounter, and

that Vazquez voluntarily participated and consented to allow Trooper Horan to search the vehicle.  (Comm. Ex. 16.)  The Pennsylvania Supreme Court denied leave to appeal on December 4, 2012.  (Comm. Ex. 17.)

On March 6, 2013, Vazquez filed a petition pursuant to the Pennsylvania Post-Conviction Relief Act, which was in effect an attempt to relitigate the suppression issues that had been decidedly adversely to him.  (Comm. Ex. 18.) After the Commonwealth noted that this was improper on collateral review, since the matter had been fully litigated on direct appeal, Vazquez's public defender filed a no-merit letter with the court, and sought leave to withdraw because there was no basis for the claims.  (Comm. Ex. 19-20.)  On March 14, 2014, the PCRA Court dismissed the petition because it improperly sought to advance issues that had previously been litigated.  (Comm. Ex. 22.)

Vazquez filed a notice of appeal on April 21, 2014.  (Comm. Exs. 23, 24.) On August 28, 2014, the Superior Court affirmed the decision of the PCRA Court, finding that the claims had been previously litigated and that Vazquez was not entitled to any relief.  (Comm. Ex. 27.)

On October 24, 2014, Vazquez filed a second PRCA petition, this time arguing that the imposition of a mandatory minimum sentence violated *Alleyne v. United States*, __ U.S. __, 133 S. Ct. 2151 (2013), which held that any fact that increases the mandatory minimum sentence for a crime is an "element" of crime

and not a sentencing factor, which must be submitted to a jury.  (Comm. Ex. 28.) This issue did not provide Vazquez any traction, however, because it had been held just months earlier in *United States v. Reyes*, 755 F.3d 210 (3d Cir. 2014) that the rule announced in *Alleyne* was a "new" rule and, therefore, not applicable retroactively to cases on collateral review, like Vazquez's.  (Comm. Ex. 29.)  On January 12, 2015, the PCRA Court dismissed Vazquez's second petition.  (Comm. Ex. 32.)  Vazquez did not appeal that decision further.

Instead, on February 20, 2015, Vazquez filed a petition for a writ of habeas corpus with this Court, together with a brief in support.  (Docs. 1, 2.)  The Commonwealth responded on May 28, 2015.  (Docs. 10, 11, 12.)  In this petition, Vazquez argues only that the state courts improperly decided the issues surrounding the traffic stop and subsequent consent search, contending that the encounter was converted into an unlawful seizure that rendered his consent involuntary, and compelled suppression of the cocaine.  In essence, Vazquez seeks to relitigate the very factual and legal issues that were fully raised and litigated in his direct appeals and his initial collateral challenge in Pennsylvania state courts.

## III.  <u>DISCUSSION</u>

### A.  **Standard of Review**

Vazquez files this petition pursuant to 28 U.S.C. § 2254 of the Antiterrorism and Effective Death Penalty Act (AEDPA).  Under the AEDPA, a federal court

may not grant habeas relief on a claim that has already been adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 97-98, 131 S.Ct. 770, 783-84, 178 L.Ed.2d 624 (2011); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).   The first prong of this test applies to questions of law and to mixed questions of law and fact, *Williams*, 529 U.S. at 384-86, 120 S.Ct. 1508-09, whereas the second prong applies to decisions that were made on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."   *Williams*, 529 U.S. at 412-13, 120 S.Ct. at 1523.   A state court decision is an "unreasonable application" of Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme

Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. at 1523.

On habeas review, a federal court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. at 1522. A federal court undertaking the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively reasonable." *Id.* at 409, 120 S.Ct. at 1522. In doing so, the federal court must presume as correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state-court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 111 S.Ct. 2590, 2594-95, 115 L.Ed.2d 706 (1991). In cases where there is no reasoned opinion from the highest state court to have considered the petitioner's claims, the federal court "looks through" to the last reasoned opinion. *Id.* at 804, 111 S.Ct. at 2595.

In addition to the foregoing standards of review, the Supreme Court has emphasized that under the AEDPA there is a heightened level of deference that federal courts must give to state-court decisions. *Harrington v. Richter*, 562 U.S.

86, 97-99, 131 S.Ct. 770, 783-85, 178 L.Ed.2d 624 (2011); *Felkner v. Jackson*, 562 U.S. 594, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (per curiam).  Thus, "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Felkner*, 562 U.S. at 594, 131 S.Ct. at 1307 (quoting *Renico v. Let*t, 559 U.S. 766, 773, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010).

However, the deferential standards apply only where the preserved issues were actually addressed by the state court on the merits.  Thus, "[b]y its own terms, § 2254(d) only applies to claims already 'adjudicated on the merits in State Court proceedings.'  Thus, if a properly preserved claim was not addressed by the state courts on the merits, the deferential standards of AEDPA do not apply." *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010) (quoting 28 U.S.C. § 2254(d) and citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).  In such cases, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Appel v. Horn*, 250 F.3d at 210 (citing *McCandles v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999)).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." *Simmons v. Beard*, 581 F.3d 158, 165 (3d Cir. 2009) (citing *Appel*, 250 F.3d at 210).

**B.** **Vazquez Has Not Presented Any Issues to This Court Upon Which Habeas Relief May Be Granted**

At the outset, we are constrained to note that Vazquez seems to have misapprehended the narrow scope of this Court's review on habeas, which has been summarized above.   In filing his petition, it appears clear that Vazquez expects that this federal court will simply reconsider the arguments that he first raised in the trial court, and again before the Pennsylvania Superior Court on direct appeal of his criminal conviction, in yet another effort to overturn the trial court's reasoned decision finding that the traffic stop and subsequent consent search violated neither Pennsylvania nor Federal law.

Yet, as noted above, this Court may *not* grant habeas relief on a claim that has already been adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 97-98, 131 S. Ct. 770, 783-84, 178 L.Ed.2d 624 (2011).   Vazquez's claims regarding the legality of Trooper Horan's search of his vehicle (and of the encounter that preceded it), were adjudicated on their merits by the trial court and on direct appeal.   (Comm. Ex. 5-16.)   Vazquez does not explain anywhere in his

14

petition how the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of federal law as determined by the Supreme Court.  Likewise, he does not persuasively argue in any fashion that the trial court or Superior Court decisions involved an unreasonable determination of the facts in light of the evidence that had been presented during the December 22, 2010, evidentiary hearing that preceded his trial, when Trooper Horan testified about the traffic stop, his brief encounter and discussion with Vazquez, and the reasons for obtaining Vazquez's consent to search the vehicle, all of which led the trial court to find that the entire encounter was lawful and that the search did not violate state or federal law.  Instead, Vazquez simply presents his petition as an invitation for the Court to consider the matter afresh on habeas review, or to consider the matter without any of the deference that we are obligated by well-established precedent to apply in cases on habeas review.  The court should decline this invitation, since it is plainly contrary to the narrow standard of review applicable to cases of this type. Moreover, as explained below, although Vazquez has not clearly alleged that the below decisions of the trial or Superior Courts involved a misapplication of clearly established federal law, a brief summary of that law makes clear that the state-court decisions are consistent with federal precedent in this field.

Although warrantless searches of automobiles typically are prohibited under the Fourth Amendment, "a search conducted pursuant to consent is one of the

specifically established exceptions to the search warrant requirement." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973)). In *Givan*, the United States Court of Appeals for the Third Circuit summarized the prevailing law regarding traffic stops and investigatory detentions.  In that case, the Third Circuit noted that "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."  *Givan*, 320 F.3d at 458. Although "'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop."  *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 13, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)).   When determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience."  *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002)).  Moreover, the Third Circuit has explained that "the Supreme Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard[] accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience,

almost to the point of permitting it to be the focal point of the analysis."  United States v. Nelson, 284 F.3d 472, 482 (3d Cir. 2002).

*Givan* is almost directly on point, and is particularly instructive in Vazquez's case, because the court took pains to note that "[e]ven assuming . . . that the brief questioning following the return of [the driver's] documents occurred while [he] had been seized for Fourth Amendment purposes rather than during a consensual encounter that began once [the driver's] documents were returned and he was informed that he was free to leave, [the officer] had a reasonable and articulable suspicion of illegal activity sufficient to extend the stop the few additional minutes it took to ask the occupants about their travel destinations."  *Givan*, 320 F.3d at 459.  Like in Vazquez's case, the Third Circuit noted that it is entirely ordinary for law enforcement officers to make some inquiry into the scope of a driver's travel plans during a traffic stop, and after receiving inconsistent or conflicting stories about the travel, an officer is "justified in further extending the stop and asking for consent to search the vehicle."  *Id.*

Here, as summarized above, the trial court credited Trooper Horan's uncontradicted testimony that Vazquez had made inconsistent statements regarding the nature of his travel; he exhibited extreme visible anxiety during the course of the encounter; he lied to the Trooper about his past criminal experience; and the state of the vehicle itself combined to give Trooper Horan reasonable suspicion

17

that Vazquez could be involved in criminal activity that would, at minimum, justify posing a few additional questions.

As in *Givan's* case, neither the brief investigatory stop nor the request for consent to search the vehicle even after having told the driver that he was free to leave constituted a violation of "clearly established federal law." To the contrary, the facts of this case as reasonably found by the trial court and upheld by the Superior Court fully supported Trooper Horan's actions during the course of a traffic stop that even Vazquez has conceded was lawful, and do not run afoul of any clearly established federal precedent. Consistent with the Third Circuit's holding in *Givan*, Trooper Horan's decision to ask Vazquez some very brief additional questions following the conclusion of the valid traffic stop did not amount to a violation of federal law, but was instead no more than a lawful encounter between the officer and Vazquez, which is what the trial court reasonably found, and provides no grounds for habeas relief.

To the extent that Vazquez is claiming that the trial court made unreasonable factual findings that led to a violation of clearly established federal law when it concluded that Vazquez voluntarily consented to a search of his vehicle, his claim fares no better in this Court. The record demonstrates that the voluntariness of Vazquez's consent was fully explored during the evidentiary hearing, and the trial court articulated numerous reasons as to why it found that Vazquez was not seized

and had voluntarily agreed to the search upon Trooper Horan's request.   As summarized by the Superior Court, the record supported the trial court's finding that although Troopers Horan and Lindsay were in uniform during the stop – which was memorialized on video – neither acted in a threatening manner, or made any displays of force; Vazquez's vehicle was not blocked in by the Trooper's patrol cars; Vazquez had begun walking back to his own vehicle after being told he was free to leave; that Vazquez voluntarily engaged in a further exchange; and that Vazquez verbally consented to Trooper Horan's request to search the vehicle. (Comm. Ex. 16, p. 12-13.)

Again, Vazquez does not explain in any persuasive way how this finding or conclusion resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   Quite the contrary, federal law is entirely consonant with the law of Pennsylvania that was applied by the trial and Superior Court in this matter.   It has long been held that voluntariness "is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048.   It is, therefore, quintessentially dependent on factual determinations, and our review of the state court decisions regarding this factual

inquiry is especially deferential.  With that deference in mind, we can perceive no "unreasonable determination of the facts" in light of facts that were adduced during the evidentiary hearing in Vazquez's case, which is precisely the conclusion reached by the Superior Court in its thorough treatment of Vazquez's appeal.

## IV.   RECOMMENDATION

In summary, Vazquez has presented a habeas petition that does little more than to request that this Court revisit his legal and factual arguments that were made to the trial court and fully litigated and resolved by the Pennsylvania Superior Court.  In seeking this review, Vazquez does not explain the basis for habeas corpus relief; instead, he simply seeks further appellate review by this Court, which is improper.  In any event, our review concludes that that the state courts' treatment of Vazquez's claims was entirely consistent with Federal law and precedent with respect to traffic stops and consent searches, and that the decisions reached can in no way be found to have been an unreasonable determination of factual issues based on the evidence that was presented during Vazquez's state criminal proceedings.  Accordingly, IT IS HEREBY RECOMMENDED THAT the Court DENY the petition for a writ of habeas corpus and close the case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion

or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 4th day of May 2016.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge